UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Carlos R. Jaquez,

            Plaintiff,

      –v–

New York City Health And Hospitals Corporation,
et al.,

            Defendants.

14-cv-3393 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    Carlos Jaquez brings this suit against his employer, the New York City Health and

Hospitals Corporation ("HHC"), and two of his former supervisors, Darryl Commodore and

Corey Cush, alleging that they discriminated against him on the basis of race and unlawfully

retaliated when he complained of discrimination. HHC and Commodore (together,

"Defendants") moved for summary judgment.[1] For the reasons that follow, Defendants' motion

is GRANTED.

## I.   BACKGROUND[2]

    Carlos Jaquez, a Latino male, was hired by HHC in August of 2011, under the title of

"Senior Consultant – Management Information Services." Pl.'s 56.1 Statement ¶¶ 1, 3. Prior to

becoming a full-time employee with HHC, Jaquez had served as an HHC consultant while

working at Integrated Support Services, Inc. ("ISS"). *Id.* ¶¶ 7-8. ISS was one of several

---

[1] According to Defendants, Corey Cush was never served with a copy of the Summons and Complaint and
should therefore be dismissed from this action. *See* Defs. Br. 1 n.1. A review of the docket confirms that there is no
indication that Cush was ever served. Jaquez has not provided any information suggesting that Cush was in fact
served or responded to Defendants' argument that he should be dismissed as a defendant. Accordingly, the Court
will dismiss Jaquez's claims against Cush.

[2] Unless otherwise noted, the following facts are not in dispute and are taken from the Plaintiff's Counter-
Statement of Material Facts ("Pl.'s 56.1 Statement"). *See* Dkt. No. 36.

1

vendors that provided information technology ("IT") support and other computer services to HHC facilities. *Id.* ¶ 7.

When Jaquez was hired by HHC, he was assigned to a team that included three colleagues that held the same "Senior Consultant – Management Information Services" title: Michael Cosmi, Richard Omaghomi, and Devon Douglas. *Id.* ¶¶ 3, 18. Cosmi is Caucasian, and Omaghomi and Douglas are African American. *Id.* ¶ 4. Like Jaquez, all three had worked as HHC consultants (through vendors that provided IT services) before being hired by HHC in 2011. *Id.* ¶¶ 9, 23, 26, 41. The parties agree that HHC considered the following three factors in deciding what salary to pay former consultants: 1) the former consultant's most recent salary; 2) the length of time the candidate had been a consultant with HHC; and 3) the candidate's credentials, including education and work experience. *Id.* ¶ 19.

Cosmi was hired by HHC in March 2011 at an annual salary of $65,000. *Id.* ¶¶ 23, 25. He had served as an HHC consultant since December 2008, and his consultant salary was $32 per hour before he was hired by HHC. *Id.* ¶¶ 24, 43. Omaghomi joined HHC in May 2011 at an annual salary of $65,000. *Id.* ¶¶ 26, 28. He had worked as an HHC consultant since October of 2008, and his consultant salary was $32 per hour. *Id.* ¶¶ 27, 43. Douglas was hired by HHC in December 2011 at an annual salary of $63,263. *Id.* ¶¶ 41, 42. He had worked as an HHC consultant since December 2008 and had been paid $44.50 per hour. *Id.* ¶¶ 41, 43.

Before Jaquez was hired by HHC, he had worked as an HHC consultant for about a year—from August 2010 to August 2011. *Id.* ¶ 8. His salary during that period was $25 per hour. *Id.* ¶ 12. When HHC hired Jaquez, it offered him an annual salary of $52,762. *Id.* ¶ 34. Jaquez thought this offer was a mistake, and he raised that concern in a phone call with Corey Cush, who was then the Assistant Vice President of Infrastructure Services at HHC and one of the individuals responsible for determining the salaries of former consultants who were converted into HHC employees. *Id.* ¶¶ 16, 17, 36, 37. Cush confirmed that the offer was not a mistake, explaining that the other recent hires "had been there longer than" Jaquez. *Id.* ¶ 37. Cush nonetheless offered Jaquez $5,000 more in salary, but Jaquez responded that he "didn't call

to negotiate the number." *Id.* ¶ 38.  Jaquez was subsequently hired at the salary he had been offered—$52,762 per year. *Id.* ¶ 40.

Jaquez's supervisor at HHC—both when he worked as a consultant for ISS and once he became an HHC employee—was Daryl Commodore, the Technical Services Manager for the IT Services Department. *Id.* ¶¶ 14, 59.  Commodore also supervised Cosmi, Omaghomi, and Douglas. *Id.* ¶¶ 9, 46.  During the first year-and-a-half or so of Jaquez's employment with HHC, he expressed frustration with several of the tasks assigned to him.  One source of contention between him and Commodore concerned the amount of time Jaquez spent receiving computer equipment at the HHC location where he worked. *See id.* ¶¶ 66-75.  This task involved unpacking boxes of computer equipment, moving the equipment a distance of about ten yards, and putting the equipment in a secure data room. *Id.* ¶¶ 68, 69.  Jaquez had to receive and unpack boxes "tens of times." *Id.* ¶ 73.  And although Jaquez occasionally received helped from Cosmi and Commodore, he maintains that he was responsible for unpacking the equipment 90-95% of the time. *Id.* ¶¶ 68, 71.  Like Jaquez, Omagahomi was responsible for receiving computer equipment, though at a different HHC location. *Id.* ¶ 75.  The parties dispute whether Omaghomi had to unpack computer equipment as often as Jaquez did. *Id.* ¶ 74.

The next issue between Jaquez and Commodore concerned Jaquez's assignment, in September 2012, to serve as the lead on a "Windows migration project"—i.e., transitioning computers at HHC from Windows XP to Windows 7. *Id.* ¶ 78.  Jaquez had to work with a project manager on this assignment, and he believed that "nothing was done properly" on the project and that the project manager was not the best person to complete the task. *Id.* ¶ 86. Jaquez asked Commodore to be taken off of the project, but Commodore denied the request and threatened to take disciplinary action against Jaquez. *Id.* ¶¶ 87, 89.

Approximately a month later, on October 24, 2012, Commodore asked Jaquez to stay late to work on a "ticket," which is essentially a request for computer service or support. *Id.* ¶¶ 60, 101.  Generally, Senior Consultants like Jaquez worked from 9 a.m. to 5 p.m., but they were asked to modify their hours on an "as needed" basis when that was necessary to complete an

assignment. *Id.* ¶¶ 98-100.  Jaquez claims though that he received more requests to stay late than others and that Commodore would let others arrive late the next day if they had stayed late the evening before. *Id.* ¶ 100.  Jaquez responded to Commodore's October 24 request by asking if he should come in late to work the next day. *Id.* ¶ 101.  Commodore replied that Jaquez should come to work on time and directed him to contact a representative from Human Resources ("HR") to confirm the schedule Senior Consultants were supposed to keep. *Id.* ¶ 101.

Shortly after this incident, Jaquez contacted HR to inquire how he could file a complaint against Commodore. *Id.* ¶ 105.  HR directed him to Tania Spencer at HHC's Equal Employment Opportunity ("EEO") office. *Id.* ¶ 106.  On October 26, 2012, Jaquez filled out an EEO complaint intake form and subsequently wrote two emails to Spencer detailing his allegations of discrimination, which included concern over his salary and instances of what he perceived as unethical treatment. *Id.* ¶¶ 107, 110.  Jaquez believed that Commodore discriminated against him because he was "the only Hispanic in the group." *Id.* ¶ 109.  This October 26, 2012 complaint was the first and only time that Jaquez complained of discrimination to anyone at HHC. *Id.* ¶ 111.  Spencer eventually made a determination that Jaquez's claim of discrimination could not be sustained. *Id.* ¶ 112.

The next dispute between Commodore and Jaquez over work assignments occurred within about a week of Jaquez filing his complaint.  In early November 2012, HHC was coping with the aftermath of Hurricane Sandy. *Id.* ¶ 113.  The storm had disrupted HHC's network and computing infrastructure, and there was significant pressure on the IT staff to get that infrastructure back online. *Id.* ¶ 114.  The HHC location where Jaquez normally worked had been flooded, so Jaquez was assigned to a different location (Jacobi Hospital) and was responsible for getting new laptops ready to be distributed to HHC employees. *Id.* ¶¶ 115-18.  Jaquez complained to Commodore over this assignment, allegedly because of the unequal distribution of work and the cleaning tasks that Jaquez claims he was assigned. *Id.* ¶ 122, 124.  Jaquez further indicated that the work of moving boxes of laptops was causing him back pain and alleges that he saw a doctor about it. *See* Baron Decl., Dkt. No. 37, Ex. 18 ("Jaquez Tr."), at

4

145. Commodore provided some assistance in unboxing the laptops, but Jaquez claims that the help was minimal. Pl.'s 56.1 Statement ¶ 123.

The parties disagree over the extent to which Commodore and Jaquez were involved in a dispute as to Jaquez's professionalism by the spring of 2013. *Id.* ¶¶ 134-37. They agree however, that Jaquez responded to an April 16, 2013 email from Commodore requesting that he build and encrypt a laptop for a new user by writing "be advised is [sic] difficult for me to expedite all requests since I'm handling the building basically by myself." *Id.* ¶¶ 138-39. The parties also agree that, at the end of a testy email exchange with Commodore on May 3, 2013, Jaquez wrote "Let's see who is inappropriate." *Id.* ¶¶ 144-48. On May 29, 2013, Commodore sent Jaquez a "Final Warning Letter," which referenced the April 16 and May 3 incidents. *Id.* ¶¶ 149-50. Jaquez was not terminated after that letter and has remained an HHC employee. *See id.* ¶ 1.

Jaquez filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on July 31, 2013. *Id.* ¶ 154. He received a Right to Sue Letter on March 31, 2014. *Id.* ¶ 155. Jaquez then brought this action against HHC, Commodore, and Cush on May 9, 2014. Dkt. No. 2. HHC and Commodore moved for summary judgment on all of Jaquez's claims on May 12, 2015. Dkt. No. 27.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Generally, "the burden is upon the moving party to demonstrate that no genuine

issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). But when the nonmoving party would bear the burden of proof at trial, "it ordinarily is sufficient for the movant to point to a lack of evidence" supporting the nonmovant's claim. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). If "the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). Accordingly, the non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, the "non-moving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

In determining whether to grant a summary judgment motion in an employment discrimination case, "additional considerations should be taken into account." *Gallo*, 22 F.3d at 1224. Specifically, "[a] trial court must be cautious about granting summary judgment to an employer when" the employer's "intent is at issue." *Id.* After all, "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Nonetheless, "[s]ummary judgment is appropriate even in discrimination cases" because "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (second alteration in original) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## III.   DISCUSSION

Jaquez's discrimination claims fall into two categories: disparate treatment and retaliation. Jaquez alleges he was paid less than his similarly situated co-workers on the basis of his race, and he further claims that his supervisors at HHC retaliated against him for complaining about his discriminatory treatment.[3] As legal authority for his claims, Jaquez relies on both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. Under both laws, however, Jaquez has failed to make the showing necessary to survive summary judgment.

## A.     Disparate Treatment Under Title VII[4]

Under Title VII, it is "an unlawful employment practice for an employer" to, among other things, "discriminate against any individual with respect to his compensation . . . because of such individual's race." 42 U.S.C. § 2000e-2(a). When courts evaluate Title VII claims, they apply the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That framework proceeds in three steps. First, a plaintiff must establish a prima facie case of discrimination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff makes that showing, "a presumption arises that more likely than not the [employer's] adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse conduct. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802). Finally, "[i]f the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the

---

[3] To the extent Jaquez's complaint can be read to raise a hostile work environment claim or to state a claim of disparate treatment on the basis of anything other than pay discrimination, Jaquez has abandoned any such claims by failing to respond to the arguments Defendants made against them in their opening brief. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Defs. Br. 10-14, 23-24.

[4] As Jaquez acknowledges, "Title VII liability does not extend to supervisors," and therefore cannot extend to Commodore as an individual defendant. Opp. Br. 1 n.1. For simplicity though, and in keeping with the terminology in the parties' briefing, the Court refers to Jaquez's Title VII claims against "Defendants."

employer's reason 'was in fact pretext' for discrimination." *Vega*, 801 F.3d at 83 (quoting *McDonnell Douglas*, 411 U.S. at 804).

Although it is questionable whether Jaquez has made even the showing necessary to establish a prima facie case, the Court ultimately concludes that, at a minimum, Jaquez has failed to demonstrate pretext.

### 1.    Prima Facie Case

"To establish a prima facie case of disparate pay under Title VII, a plaintiff must show: '(1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus.'" *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) (quoting *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002)). Here, Defendants do not dispute that Jaquez, who is Hispanic, is a member of a protected class. Nor do Defendants contest that he was paid less than non-members of his protected class. Defendants do argue, however, that Jaquez and the three co-workers he points to—Cosmi, Omaghomi, and Douglas—were not sufficiently similarly situated to create an inference that Jaquez's lower salary is the product of discriminatory animus.

In order to support such an inference, "[a] plaintiff is not obligated to show disparate treatment of an *identically* situated employee." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (emphasis in original). Rather, "it is sufficient that the employee to whom plaintiff points be similarly situated in all material respects." *Id.* Jaquez argues that he, Cosmi, Omaghomi, and Douglas were similar in all material respects because they had the same job title ("Senior Consultant – Management Information Services"), with the same duties, and had comparable employment histories and computer certifications. *See* Opp. Br. 11-12. Defendants contest this last point, arguing that Jaquez in fact had less IT experience than his three coworkers. Defs. Br. 5. Specifically, Defendants note that Jaquez worked for more than four years as a "school paraprofessional"—the full title was "Para Professional/Tech Support"—for the New York City Department of Education, and that Jaquez counts that time in his claim that

8

he had about ten years of relevant experience. Reply Br. 3 (citing Nguyen Decl., Dkt. No. 28, Ex. E). Jaquez, by contrast, asserts that his ten years of experience placed him in a comparable position to Douglas, with nine years of relevant experience, Omaghomi, with twelve years, and Cosmi, with twelve years.

Whether these four employees were similarly situated with respect to their IT experience is a question of fact for a jury. But even treating the question of relevant experience as one of disputed fact, there are other grounds for believing that Jaquez was differently situated from his co-workers in material respects. First, Jaquez had worked as an HHC consultant, prior to being hired as an HHC employee, for less time than each of his co-workers. Whereas Jaquez worked as a consultant for one year, Cosmi and Omaghomi each served as an HHC consultant for more than two years before being hired, and Douglas was an HHC consultant for three years. *See* Pl.'s 56.1 Statement ¶¶ 23, 26, 41, 43. In fact, Jaquez acknowledges that the explanation he received for his salary was that other HHC hires "had been there longer than" him. *Id.* ¶ 37. Given that "the length of time the candidate had been a consultant with HHC" was one of the three factors HHC was supposed to consider in deciding on a new hire's salary, *id.* ¶ 19, the fact that each of the three comparator employees had spent more than twice as long as a consultant is potentially material. Jaquez's only response to this allegedly material difference is that he "should not be punished with a lower salary because HHC determined to hire him out of the consulting position much more quickly than his coworkers." Opp. Br. 13. But that is an argument for HHC changing its policy, which explicitly states that new hires should have higher salaries the longer they have worked as HHC consultants. It is not an argument that goes to whether Jaquez and his colleagues were similarly situated. On this basis, then, they were not.

The second basis for not treating Jaquez as similarly situated to his co-workers is that Jaquez earned significantly less per hour prior to being hired than they did. Whereas Jaquez had made $25 per hour as a consultant, Cosmi and Omaghomi had made $32 and Douglas had made

$44.50.[5] *Compare* Pl.'s 56.1 Statement ¶ 12, *with id.* ¶¶ 24, 27, 41.  Based on these numbers, the gap between Jaquez's salary and his next-highest-paid counterpart was *greater* when he was a consultant than when he was an HHC employee.  In fact, Jaquez even concedes that he "received the *highest* percentage increase over his previous hourly salary as a consultant, as compared to . . . Cosmi, Omaghomi and Douglas." *Id.* ¶ 47 (emphasis added).  To be sure, the parties dispute in their briefs and in their competing Rule 56.1 Statements how HHC calculated the annualized salary of its consultants before making them an offer.  Specifically, Defendants claim that they multiplied a consultant's hourly rate by 1827 hours and used the resulting annualized salary as a baseline in determining the salary to offer a new employee. *See* Defs.' 56.1 Statement ¶¶ 21-22.  Applying that formula, Jaquez's annualized salary as a consultant was $45,675, meaning that HHC's offer of $52,762 constituted a 15.5% increase over his consultant salary. *See id.* ¶¶ 33-34.  Jaquez acknowledges these numbers but contends that HHC never used an 1827-hour formula in determining starting salaries.  Pl.'s 56.1 Statement ¶ 33.  Jaquez notes that, if one assumes a 2080-hour work year (i.e., 40 hours per week, 52 weeks per year), his salary offer from HHC was the equivalent of $25.36 per hour, which represents only a 1.5% increase over his consultant salary. *Id.* ¶ 47.  But whatever multiplier HHC in fact used to determine salaries—be it 1827 hours, 2080 hours, or some other metric altogether—the fact remains that Jaquez was paid substantially less than his colleagues before he was hired, yet fared better than they did (in relative terms) when he received his offer.  Given that HHC's first criterion for determining salaries was "the former's consultant's most recent salary," *id.* ¶ 19, these undisputed facts undermine Jaquez's claim that he and his colleagues were similarly situated in all material respects.

---

[5] Jaquez claims that Cosmi received an increase in his hourly compensation of $10 per hour immediately prior to being hired by HHC.  Pl.'s 56.1 Statement ¶ 24.  Jaquez concedes, however, that HHC had "no input into or authority over the hourly salaries paid by [v]endors to their consultants." *Id.* ¶ 11.  The timing of Cosmi's salary increase therefore cannot be linked to HHC.  Moreover, Jaquez never argues that HHC considered the length of time a consultant had been paid a particular hourly wage in deciding on that consultant's annual salary.

Although the preceding discussion calls into question whether Jaquez has met his burden on the "similarly situated" prong of the prima facie case, the Court will assume *arguendo* that Jaquez was similarly situated to his three co-workers. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."). And if Jaquez and his co-workers truly were similarly situated, then a reasonable jury could infer discrimination on the basis of the large gap—more than $10,000—between his salary and his co-workers'. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) ("A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably."). Accordingly, the Court assumes for purposes of this motion that Jaquez has made out a prima facie case of disparate pay.

### 2.   Defendants' Proffered Nondiscriminatory Reasons

The second step in the *McDonnell Douglas* analysis is an assessment of whether the defendant has put forward "a legitimate, nondiscriminatory reason" for its challenged action. *Burdine*, 450 U.S. at 254. To clear this step, the defendant "need not persuade the court that it was actually motivated by the proffered reasons" but must "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* The Court has no trouble concluding that Defendants have met their burden at this stage. They contend that "[a]t the time plaintiff was hired, he had a lower salary, less experience and less tenure as an HHC consultant than his colleagues." Defs.' Br. 7. Again, putting aside the question of experience, the parties agree that Jaquez spent less time as an HHC consultant, and was paid less before joining HHC, than Cosmi, Omaghomi, and Douglas. Either of those reasons, standing alone, would be a legitimate and non-discriminatory basis for paying Jaquez less.

Jaquez's only argument on this point is to emphasize that Defendants must support any legitimate reasons "through the introduction of *admissible evidence*." Opp. Br. 14 (emphasis in original) (citing *Burdine*, 450 U.S. at 255 & n.9). But Defendants have done just that. For instance, they have submitted the affidavit of Robert Kee, who served as the Assistant Vice

11

President of IT Administration at HHC when Jaquez was hired. *See* Kee Decl., Dkt No. 29. As one of the individuals allegedly responsible for deciding what salary to offer the former consultants that were hired in 2011, he would have had personal knowledge of HHC's hiring policies. *See id.* ¶¶ 10, 12. He has indicated that HHC considered a former consultant's most recent salary, the length of the candidate's experience with HHC, and the candidate's credentials in deciding on a salary offer. *Id.* ¶ 12. More to the point, Jaquez has stipulated to these considerations, as well as to the wage figures discussed above, as undisputed facts. *See* Pl.'s 56.1 Statement ¶¶ 12, 19, 24, 27, 41, 47. Defendants are not wanting for the evidence necessary to satisfy their burden under the second prong of the *McDonnell Douglas* analysis.

### 3.   Pretext

The final step in applying the *McDonnell Douglas* framework is to determine whether the plaintiff has created a genuine issue of fact with respect to whether "the employer's [proffered] reason 'was in fact pretext' for discrimination." *Vega*, 801 F.3d at 83 (quoting *McDonnell Douglas*, 411 U.S. at 804). In making this determination, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 255 n.10). If the plaintiff "has presented evidence sufficient to support an inference . . . that the reasons given by the defendant for its employment decision were not its real reasons, triable issues of fact are presented." *Stern v. Trustees of Columbia Univ. in N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997). Here, however, Jaquez has presented no such evidence.

Jaquez makes two claims relevant to the issue of pretext. The first is his assertion that Defendants "failed to follow their own purported procedure" in deciding on Jaquez's salary. Opp. Br. 15. While Jaquez is correct that "'departures from procedural regularity' can raise [a] question of discrimination," *id.* at 13 (quoting *Torres-Sylvan v. Am. Civil Liberties Union*, No. 01-CV-0343 (DAB), 2005 WL 1719788, at *10 (S.D.N.Y. July 22, 2005)), Jaquez has not raised a genuine issue of fact as to whether Defendants departed from their regular procedures in deciding how much to pay him. The basis for this alleged procedural irregularity is the claim

12

that Defendants "tried to give Mr. Jaquez a salary below the minimum for [his] position." Opp.
Br. 15.  In support of that claim, Jaquez cites to the salary schedule for his position, which sets
the minimum salary at $52,762, *see* Baron Decl., Dkt. No. 37, Ex. 15, and the Personnel Action
Request that was filled out by HHC when Jaquez was hired, *see* Baron Decl., Dkt. No. 37, Ex.
11.  In this second document, there is a typed salary of "$52,000," but that number has been
crossed out by hand, with the number "52,762" written in its place. *Id.* From this fact, Jaquez
alleges that "Defendants attempted to pay Mr. Jaquez $52,000." Opp. Br. 13.  Jaquez
acknowledges though that the first communication he received about his salary indicated that he
would be paid $52,762, as well as the fact that he was indeed hired at that salary.  Pl.'s 56.1
Statement ¶¶ 34, 40.  Any "attempt" to pay Jaquez less than minimum salary was therefore
corrected before Jaquez even received a salary offer.  Jaquez never explains how receiving an
offer that complied with HHC's minimum salary requirements constitutes a deviation from
HHC's regular procedures, and no reasonable jury could infer discriminatory intent from this
alleged "deviation."

       To further buttress his claim of procedural irregularity, Jaquez notes that HHC did not
offer him an "equity adjustment."  Opp. Br. 14.  According to the HHC Salary Policy that Jaquez
cites, an "Appointing Officer is authorized to grant equity adjustments of up to 10% for eligible
employees."  Baron Decl., Dkt. No. 37, Ex. 7 ("Salary Policy"), at 6.  Jaquez argues that, under
the Salary Policy's terms, he would have been an "eligible employee" because he had worked at
HHC for at least nine months, had a salary in the bottom 20% of the salary range for his job title,
and his salary was at least 10% below the average salary being paid to other employees with his
tenure.  Opp. Br. 14.  Even if true, the fact that Jaquez was *eligible* for an equity adjustment says
nothing about whether it was *irregular* not to offer him one.  By the plain terms of the Salary
Policy, the choice to offer an employee an equity adjustment was discretionary.  *See* Salary
Policy at 6.  Jaquez points to no evidence that any employee at HHC actually received an equity
adjustment, much less that an employee *who was similarly situated to Jaquez* received an equity
adjustment.  If he had, that might be the kind of evidence from which a jury could infer

discrimination. But the mere existence of a discretionary option for increasing an employee's salary does not, without more, create a genuine dispute of fact on the issue of whether HHC's reasons for paying Jaquez less were pretextual. Moreover, the Court notes that Cush offered to increase Jaquez's salary by $5,000 when the two discussed his compensation in September 2011—an offer that Jaquez did not accept. Pl.'s 56.1 Statement ¶ 38. That amount is approximately the same as a 10% equity adjustment for a $52,762 salary. If Defendants were willing to pay Jaquez $5,000 more at the time he was hired, i.e., when Defendants first allegedly engaged in unlawful pay discrimination, then it is hard to see how the failure to later provide a discretionary increase of essentially that same amount is evidence of discriminatory animus.

The second claim relevant to the issue of pretext is that Jaquez was paid less than his similarly situated, non-Hispanic co-workers—i.e., the same "evidence establishing the plaintiff's prima facie case," *Reeves*, 530 U.S. at 143. Jaquez is free to rely on this same evidence at the pretext stage of the *McDonnell Douglas* analysis, but "[g]iven th[e] higher burden" of proving pretext, "the deficiencies in Plaintiff's *prima facie* case become all the more apparent." *John v. Kingsbrook Jewish Med. Ctr./Rutland Nursing Home*, No. 11-CV-3624 (MKB), 2014 WL 1236804, at *15 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 598 F. App'x 798 (2d Cir. 2015). Here, the reasons put forward by Defendants—and stipulated to, for the most part, by Jaquez—provide a compelling explanation as to why Jaquez was paid less than his co-workers. Two of the three factors HHC considered when making salary decisions (time as an HHC consultant and previous hourly salary) unequivocally cut in favor of Jaquez receiving a lower salary than Cosmi, Omaghomi, and Douglas. The fact that Jaquez actually received the highest percentage increase in salary of his colleagues further strengthens the legitimacy of Defendants' proffered reasons. It is of course *possible* that, in spite of these valid reasons, HHC chose to pay Jaquez less because of discriminatory animus. But Jaquez has pointed to no evidence that would permit a reasonable jury to reach that conclusion here.

Jaquez's briefing cites to no conversations or communications with Commodore, Cush, or any other employee at HHC that would suggest racial animus. And the Court's own review of

14

the record has uncovered no evidence of pretext on the part of HHC. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). The closest the Court has come to finding such evidence is the averment in Jaquez's 56.1 Statement that "Commodore made a comment about [Jaquez's] ability to speak English." Pl.'s 56.1 Statement ¶ 92; *see also id.* ¶ 153. As an initial matter, the material cited in the 56.1 Statement is not in the record. Although Jaquez cites to page 115 from his deposition in support of his allegation, page 115 does not appear in either his or Defendants' exhibits. *See* Baron Decl., Dkt. No. 37, Ex. 18 (jumping from page 111 to page 117); Nguyen Decl., Dkt. No. 28, Ex. B (including pages 114 and 116 but omitting page 115). The Court has nonetheless found a similar allegation in the emails Jaquez sent to Spencer in reference to his EEO complaint. *See* Baron Decl., Dkt. No. 37, Ex. 16. Specifically, Jaquez claims in one of those emails that Commodore had "said to me twice in the past 2 1/2 years that I've been here 'your English is getting better/improving.'" *Id.* at 3. This evidence, however, is insufficient to infer pretext on the issue of pay discrimination. Jaquez acknowledges that it was Robert Key, Corey Cush, and HHC Central Office Human Resources—i.e., not Commodore—that determined the salaries of consultants who were converted to HHC employees. Pl.'s 56.1 Statement ¶¶ 17, 19. Without any allegation, much less evidence, that Commodore was involved in the determination of Jaquez's salary, Commodore's comments are irrelevant to Jaquez's pay discrimination claim. Absent a genuine dispute that HHC's reasons for paying Jaquez a lower salary were pretextutal, summary judgment should be granted to Defendants on Jaquez's Title VII disparate pay claim.

B.    **Disparate Treatment Under the NYCHRL**

Like Title VII, the NYCHRL makes it "an unlawful discriminatory practice" for an employer to, "because of the actual or perceived . . . race . . . of any person, . . . discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107. Although courts used to construe the NYCHRL as coextensive with the protections of Title VII, the New York City Council amended the NYCHRL in 2005 "to emphasize that 'interpretations of state and federal civil rights statutes can serve only as a floor

15

below which the [NYCHRL] cannot fall' and that the NYCHRL should 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (alteration in original) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir.2013)). Accordingly, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Mihalik*, 715 F.3d at 109 (internal citations omitted) (quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (2011)).

Just how broadly to construe the NYCHRL is an issue that "has produced some confusion." *Gorman v. Covidien, LLC*, No. 13-CV-6486 (KPF), 2015 WL 7308659, at *12 (S.D.N.Y. Nov. 19, 2015). "[W]hat remains clear" though is that a plaintiff "need only show that [his] employer treated [him] less well than other similarly situated employees, at least in part for discriminatory reasons." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013) (quotation marks and alterations omitted) (quoting *Mihalik*, 715 F.3d at 110 n.8). The "employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Mihalik*, 715 F.3d at 110 n.8 (alteration and emphasis in original) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (N.Y. App. Div. 2009)). Courts assessing NYCHRL claims often still proceed according to the three steps of the *McDonnell Douglas* framework. But "[w]here a defendant has put forward evidence of one or more nondiscriminatory motivations for its actions . . . a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out." *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 45 (N.Y. App. Div. 2011). Instead, "it should turn to the question of whether the defendant has sufficiently met its burden" of establishing that "no jury could find [the] defendant liable under any . . . evidentiary route[]." *Id.* If the plaintiff responds to the defendant's evidence "with *some* evidence that at least one of the reasons

proffered by defendant is false, misleading, or incomplete," then "such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied." *Id.* (emphasis added).

Because Defendants here have put forward evidence of several nondiscriminatory reasons for paying Jaquez less than his co-workers, the Court proceeds directly to the question of whether Jaquez has put forward "some evidence" that undermines, in any way, Defendants' rationale. The Court concludes that Jaquez has failed to make even this minimal showing.

In his brief opposing Defendants' summary judgment motion, Jaquez makes no effort to argue that, if his Title VII disparate pay claim does not survive summary judgment, his NYCHRL disparate pay claim nonetheless should. *See* Opp. Br. 9-15. He therefore has pointed to no evidence, beyond what the Court has already discussed, to indicate that Defendants' reasons for offering him the salary they did were pretextual. The Court need not rehash why that evidence is insufficient to raise a genuine dispute of fact on the issue of pretext. It is sufficient to note that neither Jaquez's allegations of procedural irregularity nor the evidence constituting his prima facie case suggest that Defendants were not actually motivated by the legitimate factors outlined in their Salary Policy when they chose to offer Jaquez a salary of $52,762. When New York courts have confronted a comparable lack of evidence, they have granted summary judgment to the defendants. *See Bennett*, 92 A.D.3d at 46 (granting summary judgment to defendant because "[p]laintiff put forward no evidence that defendant's explanations were pretextual, nor any evidence that a discriminatory motive coexisted with the legitimate reasons supported by defendant's evidence"); *see also Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 44 (N.Y. App. Div. 2012) ("[I]n response to [defendant's] uncontroverted evidence of its nondiscriminatory reasons for setting plaintiff's compensation at the levels it chose, plaintiff failed to come forward with evidence from which a jury reasonably could find that the

challenged actions were motivated, either in whole or in part, by his age."). The same result is
required here.[6]

### C.     Retaliation Under Title VII

In addition to its prohibition on race-based employment discrimination, Title VII also
makes it an "unlawful employment practice for an employer to discriminate against any of [its]
employees . . . because [the employee] has opposed any practice made an unlawful employment
practice by" Title VII. 42 U.S.C. § 2000e–3(a). Like disparate treatment claims, courts analyze
Title VII retaliation claims using the *McDonnell Douglas* burden-shifting framework. *Abrams v.
Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). To establish a prima facie case, "a
plaintiff must show (1) that [he] was engaged in protected activity by opposing [an unlawful
employment practice]; (2) that the employer was aware of that activity; (3) that [he] suffered
adverse employment action; and (4) that there was a causal connection between the protected
activity and the adverse action." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d
276, 292 (2d Cir.1998).

Jaquez identifies two allegedly protected activities of which Defendants were aware: first,
conversations with Corey Cush and Robert Kee about his salary, and second, the allegations of
discrimination Jaquez made on October 26, 2012, in the form of an EEO complaint and two
emails he sent to Tania Spencer in HR. Opp. Br. 16. Only the October 26 allegations, however,
count as protected activity. That is because Jaquez acknowledges that he did not complain about
discrimination during any of the conversations he had with Cush and Kee about his salary. Pl.'s
56.1 Statement ¶¶ 56. Although Jaquez "need not have explicitly used the words
'discrimination' or '[race]' to afford his complaints protected-activity status," he must have done
something to "put the employer on notice that [he] believe[d] himself to be complaining of

---

[6] Jaquez's fourth and fifth causes of action state claims under the NYCHRL for aiding and abetting
unlawful discrimination and for employer liability as a result of the discriminatory conduct of an employee. *See*
Compl., Dkt. No. 2, at ¶¶ 78-83. As Defendants note (and Jaquez does not contest), these claims provide additional
avenues of liability but target the same allegedly discriminatory conduct. *See* Defs. Br. 24. Because the Court
concludes that Defendants did not engage in discriminatory conduct, Defendants are entitled to summary judgment
on these additional NYCHRL claims as well.

discriminatory conduct." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 521-22 (S.D.N.Y. 2010). Complaints that his salary was too low would not have provided that notice, and those complaints therefore do not trigger the protections of Title VII's anti-retaliation provision.

Turning to the third prong that a plaintiff must prove to establish a prima facie case of retaliation, Jaquez contends that Defendants engaged in three adverse employment actions in response to his protected activity: "[1] assigning him less desirable tasks, [2] unfairly criticizing his performance and [3] providing him with a 'Final Written Warning.'" Opp. Br. 16. But the majority of this allegedly retaliatory behavior occurred *before* his October 26, 2012 EEO complaint. In fact, one of the emails Jaquez sent to Spencer about his allegedly discriminatory treatment cites some of the very same actions that Jaquez now claims were in retaliation for making that complaint. *See* Baron Decl., Dkt. No. 37, Ex. 16 at 1-5 (alleging, among other things, that Commodore unfairly criticized Jaquez's work, that Jaquez was asked to stay late when others were not, and that Jaquez was "always the . . . person to do the heavy lifting"). "[C]ourts have held that 'if the alleged retaliatory behavior pre-existed the protected activity, the plaintiff must provide some evidence of ratcheting up or increased harassment to succeed.'" *Buckley v. New York*, 959 F. Supp. 2d 282, 298-99 (E.D.N.Y. 2013) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007)). Jaquez has not alleged, much less offered evidence of, any ratcheting up of retaliatory behavior, with the possible exception of two incidents: his workload in the wake of Hurricane Sandy, and Commodore's decision to send him a Final Warning letter. But the evidence he has put forward on these incidents is not sufficient to create a genuine dispute of material fact as to whether he was the victim of unlawful retaliation.

First, with respect to Hurricane Sandy, Jaquez testified that he had to do a disproportionate share of the lifting and cleaning in the wake of the storm. *See* Jaquez Tr. 140-45. It is questionable whether this allegation truly constitutes an "adverse employment action" that would dissuade a reasonable worker from making a discrimination charge, rather than just one of the "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68 (2006).

19

But assuming that Jaquez has stated a prima facie case for retaliation, Defendants have met their burden at step two of the *McDonnell Douglas* framework to "articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Specifically, Defendants have put forward extensive testimony from Commodore indicating that all members of the IT team at HHC had to undertake abnormal responsibilities in the wake of the Hurricane. *See* Commodore Decl., Dkt. No. 30, ¶¶ 31-47. For instance, Commodore explained that Omaghomi had to "ride the train while carrying multiple laptops to get to a location where HHC end users could work." *Id.* ¶ 44. And with respect to Jaquez's individual responsibilities, Commodore indicated that the reason Jaquez had to move boxes and clean was to "clear space . . . for the incoming emergency equipment" that HHC needed to receive. *Id.* ¶ 38. Moreover, a November 15, 2012 email from Commodore to Jaquez explained that "everyone is getting their hands dirty and opening boxes and moving hardware including myself. It is a key part of our job." Nguyen Decl., Dkt. No. 28, Ex. T. In sum, Defendants have put forward several non-retaliatory reasons why Jaquez was assigned the work he was after Hurricane Sandy.

Jaquez, by contrast, has put forward no evidence to indicate that Defendants' explanation of his post-Sandy responsibilities was pretextual. In fact, Jaquez expressly disclaims that he needs to show pretext, relying instead on what he alleges to be a failure of Defendants to "explain why they singled-out [sic] Mr. Jaquez for harsh treatment." Opp. Br. 17. The closest Jaquez comes to pointing to evidence of pretext is his citation to several cases that stand for the uncontroversial proposition that the timing of an allegedly retaliatory act in relation to a complaint of discrimination can be used to infer causation. *See id.* But although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes *of establishing a prima facie case*[,] . . . such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (emphasis added). In sum, Jaquez has failed to offer evidence that would allow a

reasonable jury to conclude that the responsibilities he was assigned in the wake of Hurricane Sandy were in any way the result of his October 26, 2012 EEO complaint.

The second adverse employment action that Jaquez alleges in the wake of his EEO complaint is the Final Warning letter he received from Commodore on May 29, 2013. In contrast with many of the other allegedly retaliatory actions Jaquez cites, the issuance of a letter threatening termination clearly counts as an adverse employment action that could dissuade a reasonable employee from making a discrimination complaint. *See Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 210 (E.D.N.Y. 2009) (remarking that it was "obvious" that a "final warning constituted an adverse action" for purposes of a Title VII retaliation claim). Given that Jaquez received this letter six months after he filed his EEO complaint, however, there is reason to question whether he has made out even a prima facie case that his protected activity caused the adverse action. *See, e.g., Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (expressing doubt that a gap of two-and-a-half months between a complaint and an allegedly retaliatory act was sufficient "to establish the 'causal connection' element of [a] retaliation claim"). But assuming, again, that Jaquez has made out a prima facie case, he has failed to offer any evidence of pretext in the face of Defendants' non-discriminatory reasons for sending the Final Warning letter.

Defendants' reasons include two email exchanges between Jaquez and Commodore that occurred in far closer proximity to the Final Warning letter than Jaquez's October 2012 EEO complaint. Specifically, on April 16, 2013, Jaquez replied to an email asking him to set up a computer for a new user with the claim that he was "basically handling the building by myself." Nguyen Decl., Dkt. No. 28, Ex. BB. Commodore then advised him to "be cognizant of who is in the email string before replying to all. The user needs not to know [sic] our internal issues." *Id.* This prompted Jaquez to write back to Commodore, his supervisor, "Please don't include people that you don't think need to see our emails in the email list to avoid this from happening." *Id.* Less than a month later, on May 3, 2013, Jaquez and Commodore were emailing about another task that Commodore had assigned to Jaquez. In response to this assignment, Jaquez wrote back

21

"Please don't forget there are two us," to which Commodore replied "Your response is inappropriate." Nguyen Decl., Dkt. No. 28, Ex. CC. Jaquez then replied with "Let's see who is inappropriate . . ." *Id.* (ellipsis in original). Jaquez does not contest the substance of these emails, nor the fact that Commodore sent the Final Warning letter, which expressly referenced both email exchanges, less than a month after the May 3 incident. Pl.'s 56.1 Statement ¶¶ 138-48, 150. Accordingly, in the absence of any evidence that purports to demonstrate pretext, no reasonable jury could conclude that Commodore sent the May 2013 Final Warning letter in retaliation for Jaquez's October 2012 complaint of discrimination.

> **D.     Retaliation Under the NYCHRL**

The NYCHRL makes it unlawful for an employer "to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). Like the difference between Title VII and the NYCHRL with respect to disparate treatment, the "NYCHRL's retaliation provision is broader than Title VII's." *Ya-Chen Chen*, 805 F.3d at 76. To qualify as retaliation under the NYCHRL, an employer's actions "need not result in . . . a *materially* adverse change in the terms and conditions of employment," so long as the actions are "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8–107(7) (emphasis added). New York courts have emphasized that in analyzing a retaliation claim, "it is important that the assessment be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities." *Williams*, 61 A.D.3d at 71. Nonetheless, "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik*, 715 F.3d at 113 (internal citation omitted).

Even taking into account the low bar the NYCHRL sets for retaliation claims, Jaquez fails to clear it. Despite its differences with Title VII, the NYCHRL still requires that "where a defendant on a summary judgment motion has produced evidence that justifies its allegedly

22

retaliatory conduct on permissible grounds," the plaintiff "must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive." *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 741 (N.Y. App. Div. 2013).  As explained above, Defendants have put forward substantial evidence that justifies their treatment of Jaquez, yet Jaquez has expressly declined to point to evidence of pretext, *see* Opp. Br. 17.  The record in this case simply would not permit a reasonable jury to infer that Defendants retaliated against Jaquez for his one discrimination complaint.  Accordingly, Defendants are entitled to summary judgment on Jaquez's NYCHRL retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to all of Jaquez's claims, and the claims against Defendant Corey Cush are DISMISSED.[7]

This resolves Docket No. 27.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:  _____, 2016
        New York, New York

_____
ALISON J. NATHAN
United States District Judge

---

[7] In the alternative, the Court holds that Corey Cush would be entitled to summary judgment on all of Jaquez's claims for the reasons set forth in this opinion.